FILED

10 SEP 23 PM 2:08

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1 David Parisi (SBN 162248)
dcparisi@parisihavens.com
2 Parisi & Havens LLP
15233 Valleyheart Drive
3 Sherman Oaks, California 91403
Telephone: (818) 990-1299
4
5 Joseph H. Malley (not admitted)
malleylaw@gmail.com
6 Law Office of Joseph H. Malley
1045 North Zang Blvd
7 Dallas, TX 75208
Telephone: (214) 943-6100
8
9
10 *Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY DAVIS; JESSICA FISHBEIN; JEFF HALL; and AMANDA SPEAR, individuals, on behalf of themselves and others similarly situated, | CASE No. **CV10 7112** CBM (FMOx) |
| Plaintiffs, | JURY DEMAND |
| v. | **CLASS ACTION COMPLAINT FOR:** |
| VIDEOEGG, INC., a Delaware Corporation, | 1. Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030; |
| Defendant. | 2. Violation of California's Computer Crime Law, Penal Code § 502; |
| | 3. Violation of California's Invasion Of Privacy Act, California Penal Code § 630; |
| | 4. Violation of California's |

Consumer Legal Remedies Act, Civil Code § 1750;

5.  Violation of California's Unfair Competition Law, Business and Professions Code § 17200;

6.  Trespass to Personal Property / Chattels

7.  Unjust Enrichment

Plaintiffs, Timothy Davis, Jessica Fishbein, Jeff Hall, and Amanda Spear, on behalf of themselves and all others similarly situated, by and through their attorneys,  as and for their complaint, and demanding trial by jury, allege as follows based upon their personal knowledge as to themselves and their own acts and observations and, otherwise, upon information and belief based on the investigation of counsel, which Plaintiffs believe further investigation and discovery will support with substantial evidence.

**NATURE OF THE ACTION**

1.      Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) on behalf of themselves and a class of similarly situated Internet users, whose privacy, financial interests, and computer security rights, were violated by defendant VideoEgg, Inc., ("VideoEgg" or "Defendant").  VideoEgg acted in concert with entities involved in

whole, or part, with the advertising, Web Analytic Industry and publishers, including social blog sites, websites, advertising networks, data exchanges, traffic measurement service providers, marketing and analytic service providers that develop and service social blog sites, referred collectively to as, "VideoEgg Flash Cookie Affiliates." VideoEgg and the VideoEgg Flash Cookie Affiliates set, or allowed to be set, Flash cookies on its users' computers to use the Flash Media Player local storage on those computers to back up browser cookies for the purposes of restoring them later if deleted by the user.

2.     VideoEgg acted independently, and in concert individually with the VideoEgg Flash Cookie Affiliates that knowingly authorized, directed, ratified, approved, acquiesced in, or participated in conduct made the basis of this Class action.  VideoEgg and the VideoEgg Flash Cookie Affiliates set online tracking devices which would allow access to, and disclosure of, personal information ("PI"), personal identifying information ("PII"), and/or sensitive indentifying information ("SII") derived from Plaintiffs and Class Members' online activities. Defendant accomplished this covertly, without actual notice, awareness, or consent and choice of its users, and which information Defendant obtained deceptively, for purposes not disclosed within their Terms of Service and/or Privacy Policy, for purposes which included Defendant's commercial gain and nefarious purposes.

3.     Plaintiffs and Class Members are consumers in the United States who use their computers to access websites on the Internet and who configured their

web browser privacy settings to deny permission for third parties to set cookies on their computers, and visited online one of the VideoEgg Flash Cookie Affiliate's websites within the class period.

4.     On information and belief, consumers were also exposed to VideoEgg's technology while using other devices, such as a mobile device.  Part of one of VideoEgg's patents provides in part as follows:

> "[0069]…FIG. 2. To generate an advertisement in a webpage or flash player, for example, a request must be made for the advertisement to be inserted in the webpage or player, such as player 208. The application making the request or call is referred to herein as the calling application. The calling application could come in many different forms: (1) a standard website or web application that is based on HTML, JAVASCRIPT or CSS code; (2) a rich-media application delivered via a web-based plug-in, such as an ADOBE FLASH plug-in; (3) a rich-media component of a web application, such as a FLASH or QUICKTIME-based video player, embedded game or widget; (4) a mobile application, such as an IPHONE or mobile JAVA application; or (5) any other Internet connected application."
>                                      . . . .
> Interactive Advertising
> Abstract
> Systems and methods for dynamically sizing, structuring and operating advertisements that include a variety of content, including interaction prompts and other elements, which enable an engagement-based revenue generation model. According to one embodiment, a computer implemented method comprises storing advertising content, serving an XML file from an advertising server to an advertisement manager in order to control a player on a user computer, dynamically generating the advertisement through the player based on directions from the advertisement manager and the stored content, and tracking and reporting a user's engagement with the advertisement in order to determine compensation for the publisher.
> United States Patent Application, "Interactive Advertising" (last accessed September 15, 2010), online:
> http://appft1.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2F
> PTO%2Fsearch-bool.html&r=8&f=G&l=50&co1=AND&d=PG01&s1=videoegg&

OS=videoegg&RS=videoegg

See also, *"VideoEgg launch mobile ad serving for Apple's iPhone"* Staff (Social Media Portal), "Advertising network VideoEgg launch video and rich media mobile ad platform for iPhone" (November 18, 2008)

5.      Defendant VideoEgg, which acted with VideoEgg Flash Cookie Affiliates independently, hacked the computers of millions of consumers to plant rogue, cookie-like tracking code on users' computers. With this tracking code, Defendant circumvented users' browser controls for managing web privacy and security.

6.      Plaintiffs and Class Members that visited the websites of the VideoEgg Flash Cookie Affiliates had tracking codes installed on their computers by Defendant VideoEgg acting in concert with the respective VideoEgg Flash Cookie Affiliate website, without notice or consent, and which tracking codes could not easily be detected, managed or deleted. In cooperation with the VideoEgg Flash Cookie Affiliates, VideoEgg planted the tracking code on users' computers—but not in a browser cookie. VideoEgg and VideoEgg Flash Cookie Affiliates stored tracking code as Flash Media Player local shared objects (LSOs).

7.      The tracking code installed by the Defendant provided the mechanism to track Plaintiffs and Class Members, without notice or consent; moreover if the user deleted the browser cookie, the Flash cookie would be used to "re-spawn" the browser cookie.

8.      Defendant perpetrated this exploit so they could obtain personal

identifying information, monitor users, and to sell users' data. The personal information Defendant misappropriated and compiled, with information provided from VideoEgg and VideoEgg Flash Cookie Affiliates, includes details about user profiles to identify individual users and track them on an ongoing basis, across numerous websites, and tracking users when they accessed the web from different computers, at home and at work. This sensitive information may include such things as users' video viewing choices and personal characteristics such as gender, age, race, number of children, education level, geographic location, and household income, what the web user looked at and what he/she bought, the materials he/she read, details about his/her financial situation, his/her sexual preference, his/her name, home address, e-mail address and telephone number..

9.      Defendant's perpetration of this exploit was independently confirmed in a report issued by academic researchers and titled, "Flash Cookies and Privacy," which found that:

> a)      A user visiting site would receive a standard, browser cookie, and an identical "Flash cookie."
> b)      If the user deleted the browser cookie, the Flash cookie would be used to "re-spawn" the browser cookie.
> c)      These operations happened without any notice to the user and without any consent from the user.

"Flash Cookies and Privacy," A. Soltani, S. Canty, Q. Mayo, L. Thomas, C.J. Hoofnagle, Univ. Cal., Berkeley, Aug. 10, 2009 at 3, (last accessed September 15, 2010), online: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1446862

10.      Defendant's use of the Adobe Flash Media Player for tracking online

users was condemned by Adobe:

> *"Adobe condemns the practice of using Local Storage to back up browser cookies for the purpose of restoring them later without user knowledge and express consent."*

## JURISDICTION AND VENUE

11.     Venue is proper in this District under 28 U.S.C. §1391(b) and (c) against Defendant.  A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred in this District and Defendant conducts business with consumers in this District. Plaintiff Timothy Davis lives and has his computer in Sherman Oaks, California.

12.     Subject-matter jurisdiction exists in this Court related to this action pursuant to 28 U.S.C. § 1332.  The aggregate claims of Plaintiffs and the proposed Class Members exceed the sum or value of $5,000,000.00.

13.     Defendant has its principal place of business in San Francisco, California.  The application of the law of the State of California should be applied to any online activity made the basis of this action anywhere, within the United States, as if any and all activity occurred entirely in California and to California resident. Thus, citizens and residents of all states are, for all purposes related to this instant Complaint, similarly situated with respect to their rights and claims as California residents, and therefore are appropriately included as members of the Class, regardless of their residency, or wherever the online activity occurred made the basis of this action.

### PARTIES

14.     Plaintiff Timothy Davis ("Davis"), is a citizen and resident of Sherman Oaks, California, (Los Angeles County). Davis is a representative of the "U.S. Resident Class," and "California Class," defined within the Class Allegations.  At all relevant times herein, Davis experience(s) related to the Defendant was as an Internet user that, on one or more occasions during the Class period, in the city of his residence, accessed online a website owned and operated by a VideoEgg Flash Cookie Affiliate, which included a VideoEgg Flash Cookie Affiliate website tracking service, and had a Defendant Flash Cookie tracking device embedded within his computer.

15.     Plaintiff Jessica Fishbein ("Fishbein"), is a citizen and resident of Aventura, Florida, (Miami-Dade County). At all relevant times herein, Fishbein experience(s) related to the Defendant was as an Internet user that, on one or more occasions during the Class period, in the city of her residence, accessed online a website owned and operated by a VideoEgg Flash Cookie Affiliate, which included a VideoEgg Flash Cookie Affiliate website tracking service, and had a Defendant Flash Cookie tracking device embedded within her computer.

16.     Plaintiff Jeff Hall ("Hall"), is a citizen and resident of Forney, Texas, (Kaufman County). At all relevant times herein, Hall experience(s) related to the Defendant was as an Internet user that, on one or more occasions during the Class period, in the city of his residence, accessed online a website owned and operated

by a VideoEgg Flash Cookie Affiliate, which included a VideoEgg Flash Cookie Affiliate website tracking service, and had a Defendant Flash Cookie tracking device embedded within his computer.

17.     Plaintiff Amanda Spear ("Spear"), is a citizen and resident of Portland, Oregon, (Multnomah County). At all relevant times herein, Spear experience(s) related to the Defendant was as an Internet user that, on one or more occasions during the Class period, in the city of her residence, accessed online a website owned and operated by a VideoEgg Flash Cookie Affiliate, which included a VideoEgg Flash Cookie Affiliate website tracking service, and had a Defendant Flash Cookie tracking device embedded within her computer.

18.     Defendant VideoEgg, Inc., is a Delaware corporation headquartered in California, a privately owned corporation, doing business online, using domains which include, but not limited to: VideoEgg.com (hereinafter referred to as "VideoEgg").  Defendant maintains its headquarters at 18 Townsend St., 3rd Fl., San Francisco, California 94107. Defendant VideoEgg, Inc., does business throughout the United States, and in particular, does business in State of California and in the Central District of California.

19.     VideoEgg's website, http://www.videoegg.com, describes its business as: "a rich media advertising network composed of over 100 million uniques across more than 400 leading video, gaming and social network sites as well as social applications, commercializing interactive advertising overlays onto video."

20.    VideoEgg's "Terms of Use," dated March 3, 2009, (last accessed September 15, 2010), state in part: "VideoEgg may collect information on behalf of the advertiser. In that case, the advertiser's privacy policy would apply to the data collected and we will abide by the instructions given us by the advertiser in our handling of the data. VideoEgg uses "session", "persistent," "flash" and "browser" cookies to understand your activity on applicable Network Sites and Network delivered advertisements."

21.    VideoEgg's "Privacy Policy," dated March 3, 2009, (last accessed September 15, 2010), states in part: "VideoEgg may share personally identifiable information: (i) if VideoEgg has your consent for the sharing of personally identifiable information."

22.    VideoEgg's "Publisher Policy," dated March 3, 2009, (last accessed September 15, 2010), states in part:  "4.3 Collection from Users. Publisher acknowledges that VideoEgg may place cookies (including session, persistent and "flash" cookies), web-beacons or other tracking technology on the computer of a user who is displayed, views or interacts with an Ad to track Impressions and develop and enhance user profiles to more effectively target Ad placements throughout VideoEgg's network. In addition, Publisher acknowledges that advertisers or their agencies may also collect user information through tracking technology or other means in conjunction with any Ad ("Ad Derived Data")."

23.    VideoEgg's privacy policy discusses "opting out of ad targeting," but

it relates only to HTTP cookies/ browser cookies. Users desiring to opt out of flash cookie targeting by VideoEgg are referred to the management panel of the Adobe Flash Player located at: Macromedia.com to disable flash cookies.   "Opting Out of Ad Targeting- The opt–out works by placing a flash cookie on your computer that notifies VideoEgg that no other cookies should be placed on the applicable computer."

24.     Plaintiff and Class Members have an identical sequence of events within their computer logs, albeit date, time and user id, including interesting coding related to optout.sol:

> http://core.videoegg.com/#com/videoegg OptOut.sol
> 6/11/2010 9:12:36 PM 6/11/2010 9:12:36 PM 61
> C:\Documents and Settings\[name redacted]\Application
> Data\Macromedia\Flash Player\#SharedObjects\[user id
> redacted]\core.videoegg.com\#com\videoegg\OptOut.sol

25.     VideoEgg's "Publisher Policy" restricts publisher access to user's data: "4.4 Ad Derived Data. Publisher shall not analyze or attempt to derive any information contained in any cookie or other tracking technology used by VideoEgg or the applicable advertiser/agency to collect information about users."

26.     VideoEgg Terms of Use and Privacy Policy relate only to individuals that access its website by choice, excluding any method or means involving browser hijacking, and with actual notice; thus omitting the Plaintiffs and Class Members.

27.     The conduct complained of includes, but is not limited to, the

interception of Electronic Communications of Plaintiffs and Class Members, by Defendant VideoEgg, after Defendant VideoEgg respawned their browser cookie for tracking purposes, without user's knowledge or consent, obtained in transit and temporarily stored for a limited period in their computer's electronic storage. *In re: Doubleclick, Inc. Privacy Litigation,* 154 F. Supp.2d 497,00 Civ. 0641 (S.D.N.Y., March 28, 2001)

28.     The conduct of VideoEgg individually and in concert with the VideoEgg Flash Cookie Affiliates, individually and jointly, is a fraud that has been perpetrated for years, facilitated, and coordinated, by some of the world's largest websites and the network advertising industry, thereby costing the Class upwards of tens of millions of dollars. Defendant has been systematically defrauding Class Members in a covert operation of surveillance made possible by their gross misconduct, negligence, apparent coordination, and actual fraud, and violating one or more of the following:

a)  Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA");

b)  Electronic Communications Privacy Act 18 U.S.C. §2510 (the "ECPA");

c)  California's Computer Crime Law, Penal Code § 502 (the "CCCL");

d)  California's Invasion Of Privacy Act, California Penal Code § 630;

e)  California's Consumer Legal Remedies Act, Civil Code § 1750 ("CLRA");

f)  California's Unfair Competition Law, Business and Professions Code §

17200 ("UCL");

g) Trespass to Personal Property / Chattels; and

h) Unjust Enrichment

29.     On information and belief, VideoEgg Flash Cookie Affiliates' privacy documents omit entirely the actual identity of its association with VideoEgg, or any and all involvement of VideoEgg with the VideoEgg Flash Cookie Affiliate site, limiting the user's awareness of, and an inability to determine accurately, the involvement of VideoEgg, let alone locate the VideoEgg website, compounded further by VideoEgg defining its business as a video aggregator, hosting service, and also an ad network, while the VideoEgg Flash Cookie Affiliates' privacy documents do not refer to such associations.

30.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents describe "associations," misleading the users which interpret such to be associated corporate subsidiaries, withholding accurate information that such includes entities other than advertising networks.

31.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' websites, and its tracking services, are owned by parent companies that have many subsidiaries and fail to provide adequate information about third-party information sharing, different than affiliate sharing, which is subject to more restrictions, including opt-in or opt-out consent requirements. These restrictions are based upon the heightened risk associated with sharing information with unrelated entities,

which have different incentives than the entity that collected the user data.

32.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates do not make adequate distinctions between sharing with affiliates, contractors, and third parties, instead, vaguely stating that they do not share user data with unrelated third parties and vaguely disclosing that they share data with affiliates. Users must interpret an affiliate to be a third party, but given the actual usage of these terms of VideoEgg Flash Cookie Affiliates' privacy policies, that assumption would be mistaken.

33.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliate users are unable to identify the corporate families to which these Defendant websites belong; which makes it difficult for a user to discover exactly who such associated entities are, thus their practices are deceptive. The conflicting statements in the privacy policies would most likely confuse or mislead a reasonable consumer. The confusion would also likely be to their detriment, as surveys indicate that users do not want companies to collect data about them without permission.

34.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents fail to provide adequate notice that Defendant VideoEgg and VideoEgg Flash Cookie Affiliates allow access to personal behavioral data of their users, including but not limited to, such data embedded with their cookies, to VideoEgg, which in turn shares the data with its marketing partners or corporate affiliates and subsidiaries, meaning that user behavior will be profiled by any other entities with

whom those sites may choose to share this information. Defendant VideoEgg and VideoEgg Flash Cookie Affiliates state they do not share data with third parties, but they do share data with affiliates, suggesting that they only share data with companies under the same corporate ownership.

35.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents referenced the use of Flash cookies, but state such is used only for audience measurement and not behavioral ad-targeting. The opt-out is inconspicuous on their privacy page and appears in a small font header in the corner of the page.

36.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents do not expressly state that if a VideoEgg Flash Cookie Affiliate user opts out that behavioral information will not be collected and shared, but only that the Defendant VideoEgg and VideoEgg Flash Cookie Affiliate user will not receive Internet based advertising content from its "advertising delivery service"; moreover its opt-out "unique cookie value" includes identifying information which means the cookie is no longer non-unique.

37.     Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents falsely imply some level of protection for the user. Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents are sufficiently vague so as to refrain from fully disclosing information to their users about what information is collected through their websites and their associated

entities, how the information is used, and the purposes for the collection and use of this information, negating the possibility for their users to provide informed and meaningful consent to these practices. Without adequate notice and informed and meaningful user consent, users have no control over their personal information, thus, the potential privacy dangers were not readily apparent to most users.

38.    Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents incorporate a multitude of hedging and modality markers so as to minimize their use of covert surveillance technology and data-gathering tools, while sending mixed messages related to privacy controls, advising users that choosing to exercise such controls would cause in whole, or part, diminished functionality of their websites, while such documents emphasize all cookies are very small, thus unobtrusive, and pose no threat since "many websites use them."

39.    Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents fail to adhere to an adequate notice and choice regime, predicated on user choice, and informed by privacy policies.  Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents provided nuanced situations that created conditional yes or no answers to these basic questions about a site's data collection and sharing practices, thus it is unclear how an average user could ever understand these practices since the nuances were not explained in the privacy policy. Choice, therefore, cannot be inferred.

40.    Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy

documents fail to provide notice that their data storage practices as they relate to the period for which user data is stored, have no term period, and are indefinite.

41.    Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' privacy documents carefully attempt to parse the definitions of phrases related to their tracking activity. Their privacy documents omit any direct reference to Flash cookies, embedding surveillance technology into the user's computer hardware, use of user's computer hardware to store data, use of technology to allow the perpetual online tracking and surveillance of any and all online Internet activity of the VideoEgg Flash Cookie Affiliate user.  They also refrain from disclosing that the VideoEgg Flash Cookie Affiliate would use the user's local storage to back up browser cookies for the purpose of restoring them later without user knowledge and express consent.

42.    Defendants' privacy document verbiage was deceptive by design. This deception is especially troubling when compared with the obligation imposed upon their online visitors to download, read, and comprehend the vast amount of documents required to protect one's online privacy, complicated by the cumulative effect of such task. This is accentuated by an analysis of a VideoEgg Flash Cookie Affiliates privacy documents, known to be involved with VideoEgg:

VideoEgg Flash Cookie Affiliate's Privacy Documents:

| Document: | Word Count: | Hard Copy Count: |
|---|---|---|
| 1.    Privacy Policy | 1,378 | 5 |

|   |   |   |   |
|---|---|---|---|
| 2. | Terms of Use | 3,820 | 12 |
| 3. | About Section | 403 | 2 |
|   | TOTAL: | 5,601 | 19 |

43.     In addition to downloading, reading and comprehending all of the VideoEgg Flash Cookie Affiliates privacy documents, its users would be required to locate the website for VideoEgg and repeat this obligation for VideoEgg's privacy documents. To accentuate the improbability of completing this task though, VideoEgg Flash Cookie Affiliate website visitors are not provided any information of the identity of VideoEgg within VideoEgg Flash Cookie Affiliates, nor any of the VideoEgg Flash Cookie Affiliates', Terms of Service and Privacy Policy. For sake of analysis, the VideoEgg Flash Cookie Affiliate website visitors' obligation would involve the following:

VideoEgg Privacy Documents:

|   | Document: | Word Count: | Hard Copy Count: |
|---|---|---|---|
| 1. | Privacy Policy | 1,357 | 5 |
| 2. | Ad Platform Privacy Policy |   |   |
|   | & Opt Out | 2,471 | 9 |
| 3. | About VideoEgg | 1,488 | 6 |
| 4. | VideoEgg People Networks | 464 | 3 |
| 5. | VideoEgg Experience | 437 | 4 |
| 6. | VideoEgg Insight | 450 | 3 |
|   | TOTAL: | 6,667 | 30 |

44.     In addition to the VideoEgg Flash Cookie Affiliates and VideoEgg privacy documents, a user would be obligated to review their flash media player's

privacy documents. Some Internet users possess multiple flash media players, and many are not aware of the identity of their flash media player nor are provided information from Defendant as to the identity of the flash media player being apprehended for use by the VideoEgg Flash Cookie Affiliate and/or VideoEgg. If a user could identify their involved flash media player, and the identity of the corporate entity for the flash media player, the user would have additional obligations imposed upon them to download, read, and comprehend the flash media player's privacy documents, such as Adobe's, the largest flash media player provider:

Adobe's Flash Media Player Privacy Documents:

| | Document: | Word Count: | Hard Copy Count: |
|---|---|---|---|
| 1. | Privacy Policy | 3,572 | 6 |
| 2. | Terms of Use | 4,691 | 10 |
| 3. | Flash Player Help | 100 | 1 |
| 4. | Settings Manager | 1,891 | 4 |
| 5. | Global Privacy Settings Panel | 243 | 1 |
| 6. | Global Storage Settings Panel | 629 | 2 |
| 7. | Global Security Settings Panel | 1,280 | 3 |
| 8. | Global Notifications Settings Panel | 114 | 1 |
| 9. | Website Privacy Settings Panel | 290 | 1 |
| 10. | Website Storage Settings Panel | 727 | 2 |
| 11. | Display Settings | 259 | 2 |
| 12. | Local Storage Settings | 1,159 | 3 |
| 13. | Microphone Settings | 370 | 2 |
| 14. | Camera Settings | 298 | 2 |
| 15. | Privacy Settings | 787 | 2 |

| | | | |
|---|---|---|---|
| 16. | Local Storage Pop-Up Question | 1,030 | 3 |
| 17. | Privacy Pop-Up Question | 648 | 2 |
| 18. | Security Pop-up Question | 823 | 2 |
| 19. | About Updating Flash Player | 749 | 2 |
| | TOTAL: | 19,660 | 51 |

45.     VideoEgg Flash Cookie Affiliates' users' online privacy protection was premised upon an imposed requirement to download, read and comprehend the accumulation of all privacy documents of VideoEgg Flash Cookie Affiliate, VideoEgg, and the user's flash media player, such as Adobe, noting for analysis and emphasis, the following:

Defendants' Collective Privacy Documents:

| | Document: | Word Count: | Hard Copy Count: |
|---|---|---|---|
| 1. | VideoEgg Flash Cookie Affiliates-Privacy Policy | 1,378 | 5 |
| 2. | VideoEgg Flash Cookie Affiliates-Terms of Use | 3,820 | 12 |
| 3. | VideoEgg Flash Cookie Affiliates-About Section | 403 | 2 |
| 4. | VideoEgg- Privacy Policy | 1,357 | 5 |
| 5. | VideoEgg- Privacy Policy & Opt Out | 2,471 | 9 |
| 6. | VideoEgg- About | 1,488 | 6 |
| 7. | VideoEgg- People Networks | 464 | 3 |
| 8. | VideoEgg- Experience | 437 | 4 |
| 9. | VideoEgg- Insight | 450 | 3 |
| 10. | Adobe- Privacy Policy | 3,572 | 6 |
| 11. | Adobe- Terms of Use | 4,691 | 10 |
| 12. | Adobe- Flash Player Help | 100 | 1 |

| | | | |
|---|---|---|---|
| 13. | Adobe- Settings Manager | 1,891 | 4 |
| 14. | Adobe- Global Privacy Settings Panel | 243 | 1 |
| 15. | Adobe- Global Storage Settings Panel | 629 | 2 |
| 16. | Adobe- Global Security Settings Panel | 1,280 | 3 |
| 17. | Adobe- Global Notifications Settings Panel | 114 | 1 |
| 18. | Adobe- Website Privacy Settings Panel | 290 | 1 |
| 19. | Adobe- Website Storage Settings Panel | 727 | 2 |
| 20. | Adobe- Display Settings | 259 | 2 |
| 21. | Adobe- Local Storage Settings | 1,159 | 3 |
| 22. | Adobe- Microphone Settings | 370 | 2 |
| 23. | Adobe- Camera Settings | 298 | 2 |
| 24. | Adobe- Privacy Settings | 787 | 2 |
| 25. | Adobe- Local Storage Pop-Up Question | 1,030 | 3 |
| 26. | Adobe- Privacy Pop-Up Question | 648 | 2 |
| 27. | Adobe- Security Pop-up Question | 823 | 2 |
| 28. | Adobe- About Updating Flash Player | 749 | 2 |
| | TOTAL: | 31,928 | 100 |

46.     A millisecond was the time allotted to an online visitor opening VideoEgg Flash Cookie Affiliates' webpage, before a flash cookie was embedded by Defendant VideoEgg, within their computer and data collected immediately, without their awareness, knowledge or consent to such actions. This occurred without the benefit of being provided adequate time to access, read, and attempt to comprehend the Terms of Service/Use and Privacy Policy for VideoEgg Flash Cookie Affiliates' website, VideoEgg's, and the website of the user's flash media player. While only the most technically savvy online users are familiar with cookies, a finite amount of individuals even know about flash cookies, let alone could possibly comprehend the technical aspects of flash cookies inherent within

the 31,928 words and 100 hard copy pages.

## SUMMARY OF FACTS

### A. **Background**

47.     This consumer class action involves a pattern of covert online surveillance, wherein Defendant VideoEgg targeted Internet users that visited VideoEgg Flash Cookie Affiliates' websites, to knowingly, and without the user's knowledge or consent, to set a tracking device within the user's Flash media player.  This tracking device was able to override the user's security preferences, by setting, or allowing to be set, a flash cookie on its user's computer hard drive to use its local storage within the flash media player to back up browser cookies for the purposes of restoring them later, if deleted by its users. This practice also referred to as "browser cookie re-spawning," circumvented the user's intent to clear browser cookies. The objective of this scheme was the online harvesting of consumers personal information for online marketing activities.

48.     The business practice of covertly placing Flash cookies on its users' computers to back up browser cookies for the purposes of restoring them later, if deleted by users, is becoming a problem of epidemic proportions.  It has continued due to self-regulation and unregulated federal overview, aligned in whole or part with the Web Analytic Industry, where success and survival of web analytic entities is determined upon its continued development of innovative methods to

assist the advertising networks. Competition is impeded only by the technological advances of computer hardware and software companies attempting to circumvent web analytic tracking tools.

**B. Web Analytics**

49. The advertising Industry's use of flash cookies for respawning required the involvement of the web analytic and digital measurement industry. Without its involvement the advertising industry could not collect data, analyze the data, or commercialize the data. The web analytic and digital measurement industry's success and survival is predicted on developing new and innovative technology to remain ahead of technology designed to thwart its effort.

50. The phrase "Web Analytics" can refer to several different topics, anything from putting a page counter on several key pages on a website to the use of sophisticated web server log analysis software to analyze website visitor navigation patterns on a site.

51. Upon each visit to a website or a page within that site, a person's computer leaves certain electronic tracks or markers. Taken together, those markers create a trail of information commonly referred to as "clickstream data."

52. Clickstream data may include basic information, such as the type of computer an individual used to access the Internet, the kind of Internet browser utilized and the identification of each site or page visited. In addition, were an individual to disclose certain information during the visit, the clickstream data may

also include more personalized details, such as passwords, e-mail addresses, credit card numbers, name, address, date of birth, gender, or zip code.

53.     Every time someone visits a website, information about that visitor is stored in a server log, including the date and time of the visit, which pages the person viewed, their approximate location, and information about the computer and software they used to access a site. It was soon realized that these log files could be read by a program to provide data on the popularity of the website. Thus arose web log analysis software.

54.     The web analytic software needed a method to track user sessions on websites, since JavaScript on a web page did not allow tracking except on a new page load. Third-party tools installed on a website allowed the users' information to be sent directly to the provider of that tool, and that data allowed the provider to use such for its own purposes.

55.     Web analytics was initially the collection and measurement of data for the purpose of optimizing website usage; a relatively simple process of data capture, collation and report. Historically, raw data was captured by web server logs, interrogated and reported by simple analytics systems. This in turn was used to optimize the site in accord with visitation trends. Most people used web analytics as a tool to enhance the web presence. Others, like Defendant VideoEgg, saw it as a niche, and a potentially very profitable opportunity.

56.     Using various web statistics and analytics tools, the initial purpose for

web analytic was to determine how people were finding a website, where visitors are located geographically, and what parts of a site they're visiting. Used thoughtfully, website statistics can inform website design choices, help make websites more user-friendly and navigable, and influence overall communications and marketing strategy. Web analytics used in an "evil" manner violates user's privacy in addition to, ethical guidelines of web analytic associations.

57.     In the early 1990s, website statistics consisted primarily of counting the number of client requests (or hits) made to the web server. This was a reasonable method initially, since each website often consisted of a single HTML file. However, with the introduction of images in HTML, and websites that spanned multiple HTML files, this count became less useful.

58.     Two units of measure were introduced in the mid 1990's to gauge more accurately the amount of human activity on webservers. These were page views and visits (or sessions). A page view was defined as a request made to the web server for a page, as opposed to a graphic, while a visit was defined as a sequence of requests from a uniquely identified client that expired after a certain amount of inactivity, usually 30 minutes. The page views and visits are still commonly displayed metrics, but are now considered rather unsophisticated measurements.

59.     The emergence of search engine spiders and robots in the late 1990's, along with web proxies and dynamically assigned IP addresses for large companies

and ISPs, made it more difficult to identify unique human visitors to a website. The Web Analytic Industry responded by tracking visits by cookies.

60.     To use web analytics, a web beacon must be inserted into each page on a website. A beacon, sometimes referred to as a web bug, is a small piece of code that sends information about the viewer to a third party. Beacons send immediate information about a visitor to their manufacturer and in many cases create cookies.

61.     The web analytics service also manages the process of assigning a cookie to the user, which can uniquely identify them during their visit and in subsequent visits.

62.     There are basically two approaches to collecting on-site web analytics data. The first, "page tagging", uses a small bit of JavaScript code placed on each web page to notify a third-party server when a page has been viewed by a web browser.

63.     The second and more traditional approach to web analytics is "log file analysis", where the log files that Webservers use to record all server transactions are also used to analyze website traffic.

64.     Advertising network's objective is to have every one of its associated websites visitation data collated in a manner that reports all the data captured back to the advertising network. This provides access to profiling databases of all users that have visited its associated sites online. The only catch was how to get millions

of website owners to install something, without their knowledge, that by design, takes private and personal information without permission, payment, or the option for people visiting these sites to 'opt-out' of the collection of their personal information. The answer is that advertising networks rely on web analytic companies to do the dirty work by designing and implementing this deceptive technology.

65.    The Web Analytic Industry initially resisted the opportunity to aggregate customer's data, since website privacy policies strictly promised its users that it would not use their information in this capacity and for its own commercialization outside of providing a specific service to them, for which they contacted the website; however the advertising industry sought this data, thus some, but not all web analytic companies, sought profits over privacy and provided a service of deception.

C. **Web Browser Preferences**

66.    Computers are used for everything from banking and investing to shopping and communicating with others through email or chat programs. Although online communications may not be considered "top secret," online users do not want third parties reading their email, or examining personal information stored on their computer (such as financial statements), or downloading software, such as Flash cookies, without their knowledge or consent.

67.    Individuals have a reasonable expectation of privacy in their personal

computer, the integrity of their computers, and the confidentiality of their communications with the Internet websites that they visit, using their Internet connection to transmit and receive personal and private data, including but not limited to, personal emails, personal Internet research and viewing, credit card information, banking information, personal identifiable information such as social security number, date of birth, and medical information.

68.     Since some companies that use cookies have figured out methods of tracking users when users visit various sites, most modern browsers allow users to set whether to allow or disallow HTML Cookies, by setting a browser to accept all cookies, to reject all cookies, or to notify you whenever a cookie is offered so that you can decide each time whether to accept it. When the user is prompted, the contents of the cookie can be viewed and the user can select whether to Deny, Allow for Session, or Allow the cookie. This gives the user more information about what sites are using cookies and also gives more granular control of cookies as opposed to globally enabling them.

69.     Excluding the propaganda advanced by the advertising industry to promulgate its questionable activities to the governmental authorities and privacy groups funded by the Advertising Industry, a majority of online users do not want tailored advertisements:

> *"Contrary to what many marketers claim, most adult Americans (66%) do not want marketers to tailor advertisements to their interests. Moreover, when Americans are informed of three common*

*ways that marketers gather data about people in order to tailor ads, even higher percentages - between 73% and 86% - say they would not want such advertising."*

Turow, Joseph, King, Jennifer, Hoofnagle, Chris Jay, Bleakley, Amy and Hennessy, Michael, "Americans Reject Tailored Advertising and Three Activities that Enable It" (last accessed September 15, 2010), online: http://ssrn.com/abstract=1478214

70.     Browser cookie controls and preference settings provide greater user privacy control. The purpose of a browser privacy mode is to allow users to browse the Internet without leaving data tracks. Browsers save visited websites in the browsing history, downloaded files in the download history, search terms in the search history, and data typed into online registration forms including cached version of such files. Cookie controls allow the user to decide which cookies can be stored on their computer and transmitted to websites, and using parental controls to block specific content by adjusting the tabs located within the user's browser.

71.     Cookie controls and user privacy preference settings provided protection, but the advertising network demanded the Web Analytic Industry respond with new technology to override user's preferences on their own computers. The answer to the advertising networks dilemma came about with "flash cookies."

**D. <u>Flash Player- Cookies-LSO</u>**

72.     Flash Player is an application that, while running on a computer that is

connected to the Internet, is designed to contemporaneously interact with websites containing Flash content that are being visited online. As such, under certain configurations, the application has the potential to silently compromise its users' Internet privacy, and do so without their knowledge. When stored on a user's computer, (.sol) files are capable of sending personally sensitive data back out over the Internet without the user's knowledge to one or more third parties.

73.     Flash cookies are not transferred from the client back to the server like HTTP cookies. Instead, downloaded Flash objects that run locally in the web browser [locally stored/run objects] read and write these cookie-like files. Using JavaScript, this data can be pulled out of the Flash objects and then used like any other data by the web application. It is not necessary to have any visible signs that a Flash object is running on a given page. In fact, it would be difficult to reliably detect if an application were using Flash cookies. When you drill down in each domain's directory, you will eventually find a "SOL" file. This file contains the data that is stored and used as the Flash cookie.

74.     DOM Storage is often compared to HTTP cookies. Like cookies, web developers can store per-session or domain-specific data as name/value pairs on the client using DOM Storage. However, unlike cookies, DOM Storage makes it easier to control how information stored by one window is visible to another.

75.     Functionally, client storage areas are quite different from cookies. DOM Storage doesn't transmit values to the server with every request as cookies

do, nor does the data in a local storage area ever expire. And unlike cookies, it is easy to access individual pieces of data using a standard interface that has growing support among browser vendors. If objects are stored in a Local Object Repository then these are available to specific actions but not to all the actions. But if these objects are stored in one or more Shared Object Repositories then multiple actions or tests can use them.

76.     A local shared-object can only be read by the same domain that originates the shared object.  Currently, using a local shared-object is the only way to instruct a Flash movie to write data to the user's hard drive directly from within the movie.   On Windows, local shared-objects are stored in Documents and Settings\userName\Application Data\Macromedia\Flash Player\#SharedObjects. According to the Macromedia docs, local shared-objects have a file extension of .SO, but saved with .SOL extension on Windows XP. Unlike cookies that are capable of storing only text values, Local Shared Objects can store many data types including Number, String, Boolean, XML, Date, Array, and Object.

77.     Flash LSO cookies properties:

- SOL files are stored outside of the browser's cache, and removed when a web browser's cache is cleared.
- By default they offer storage of 100 KB (compare: Usual cookies 4 KB).
- Browsers are not aware of Flash cookies, and LSO's usually cannot be removed by browsers.
- Flash can access and store highly specific personal and technical information (system, user name, files...).
- Ability to send the stored information to the appropriate server,

without user's permission.
- Flash applications do not need to be visible
- There is no easy way to tell which Flash-cookie sites are tracking you.
- Shared folders allow cross-browser tracking
- There is currently no mechanism to force a shared-object to "expire". Browser cookies have an expiration mechanism built in.
- User can only disable local shared-object by disallowing a particular site to write to the user's hard drive.  This can be done in the Macromedia player Setting window.

78.     Since Flash runs independently from the browser, it needs its own temporary storage area for websites to store information related to the Flash movie, saving objects, in either the local or shared object repositories. The data is split into two folders: "#SharedObjects" and "macromedia.com". The content located inside the "macromedia.com" is set by the site and controls settings for the site visited, while the content located inside "#SharedObjects" is created by the site visited or a third party company and contains the cookie values we are researching.

79.     Defendant's Flash cookie setting process was a system, method and computer readable medium configured to track Internet users as they browse web-sites when cookies are disabled or deleted. VideoEgg Flash Cookie Affiliate's website receives a request for content from the computing-device. After obtaining information about the computing-device, the tracking-server assesses the request for content from the computing-device. If the computing-device has an available Flash plug-in, the tracking-server transmits a Flash applet to the computing-device. The Flash applet is configured to: determine whether a unique Flash identifier has been assigned to the computing-device, generate the unique Flash identifier if no

unique Flash identifier has already been assigned to the computing-device, transmit the unique Flash identifier to a tracking server, and store the unique Flash identifier in local Flash storage. The process also stores a cookie at the computing-device when no Flash plug-in is available.

**E. Overlapping Values**

80.     The "Flash Cookies and Privacy," study attempted to infer the intended uses of particular Flash cookies by examining the variable name for each cookie, *i.e.*, volume, userID, and user, referred to as a "unique identifier;"

> *"It's also worth mentioning that '_tpf' and '_fpf' were found to also contain unique identifiers which were also found to contain overlapping values as the ones found in HTML cookies for 'uid' or 'userid.'"*

> *"Of the top 100 websites, 31 had at least one overlap between a HTTP and Flash cookie. For instance, a website might have an HTTP cookie labeled "uid" with a long value such as 4a7082eb-775d6-d440f-dbf25. There were 41 such matches on these 31 sites. Most Flash cookies with matching values were served by third-party advertising networks. That is, upon a visit to a top 100 website, a third party advertising network would set both a third party HTTP cookie and a third party Flash cookie."*

Ashkan Soltani, Shannon Canty, Quentin Mayo, Lauren Thomas, Chris Jay Hoofnagle, *"Flash Cookies and Privacy"* (10 August 2009), online: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1446862.

81.     Zombie cookies, or browser cookies that are respawned by Flash cookies, required a Flash setting file and a directory, labeled by the domain, which set the Flash cookie. This created a history of all users' activities, thus the coding required was neither inadvertent nor an unintended effect, and permitted the Flash cookie to respawn a deleted browser cookie derived from the history data file.

82.     The expiration date of cookie information and the entropy of the

information contained in the cookie provides limited information. If the entropy is low (e.g. content is "volume =5") then it can be assumed to be a legitimate setting to be saved. If the entropy is high (e.g. "userId = b56574ce78d2f110b1gd522") then it is more likely than not a tracking id connected to a background database of user information, i.e. a user goes to a website wherein the algorithm locates a normal cookie stored by an advertising network, then the algorithm searched for repeating keys. Every character (at least in a charset like ASCII) counts one byte, thus counting the number of characters in "id=344499284532" which are 15 and in "volume_level=98, language=English" which are 32. The analysis of both HTTP and Flash cookies for key identifiers revealed undisputable correlations including overlapping values.

83.    Researchers were able to identify a high number of cookies similarly labeled such as: "user ID." These cookies stored unique identifiers that allowed user tracking; however unlike HTTP cookies used for tracking, these cookies had overlapping values. This respawning was because the Flash cookies, provided by VideoEgg, had the same data values as the HTTP cookies provided by the VideoEgg Flash Cookie Affiliates.  In effect the Flash cookies acted as a back-up on the computer systems once the HTTP cookies had been removed.  If users simply deleted cookies without clearing the browser cache, the identifiers in the deleted browser cookies still returned to the cookies, more than likely, using information stored in the cache.

84.    When HTML cookies are deleted, the users would get a new value when visiting the site. But when Flash cookies and HTML cookies are given the same value, as they were on 31 of the top 100 websites, "it will restore the value of your original cookie, and thereby nullifies the deletion of the HTML cookies," Soltani said.

Moscaritolo, Angela. "Top Websites using Flash cookies to track user behavior." *SC Magazine*, August 9, 2009, (last accessed September 15, 2010), online: http://www.scmagazineus.com/top-websites-using-Flash-cookies-to-track-user-behavior/article/141486/

**F.  VideoEgg's Business Practices**

85.    The advertising networks use of Pay Per Impression ("PPI") advertising became less effective over the years since users had become overwhelmed with banner advertisements and began to ignore such ads. Advertisements would continue to pay for impressions, but the ads value was diluted due to online users' lack of interest. Pay Per Click ("PPC") advertising provided limited benefit since the period required for brand awareness or new products jeopardized the company's budget restraints. The advertising networks challenge was to be able to create accountability to its network as to the effectiveness of their advertisements.

86.    VideoEgg's response to this dilemma was to use an advertising format involving "layer technology," video, and an "engagement" protocol which provided no notice or consent to the online visitor confronted with this type of ad, which also embedded the technology into user's hardware by setting a flash cookie

on individual's computer hard drive to use its local storage within the flash media player to back up browser cookies for the purposes of restoring them later, if deleted by its users.

> *"The engagement properties include the user's movement of a cursor over the advertisement content (a "mouse over"), the user's entry of one or more keystrokes from a keyboard, clicking on or otherwise selecting the advertisement content, allowing a countdown or timer to expire as a result of a sustained mouse over the advertisement content, or some other form of user interaction with the advertisement."*

87.   Floating ads, slide-Over ads, hover ads, sliding ads, flying ads, slide-in ads, pop-ups have been around now, in some form or fashion, for almost a decade. This is not innovative technology, but only new advertising tracks with old technology. When a user visits a website these types of ads cover all or some of the web page. Any attempt to close, or "drag" these ads may activate an "engagement," which would then allow the ad network to prompt tracking devices. Technology prevailed to assist online users and most are now easily blocked by pop-up blockers; however depending upon the technology used by these ads, user's privacy settings may not control and block all such ads.

88.   The first movable HTML elements were introduced with the so called "layer technology". These hover type ads tend to be very hard to block by pop-up blocking software because the hover ad window is an integral part of the HTML content of the web page. Thus, a software filtering the content has no algorithmic means of recognizing and removing parts of the content, either descriptive or

procedural, that create, populate and manipulate the hover ad's window.

## G. **VideoEgg's Twig**

> *"VideoEgg is offering a new advertising format that will be hard for web users to ignore: A toolbar-style ad that it calls Twig. It runs at the top or bottom of web pages, scrolls with you as you move up and down the page, and expands to show videos or other media when you hover your cursor over it for three seconds. The problem this format is trying to solve is that web readers tend to scroll down as they're reading and not see banner ads at the top of sites."*

Eric Eldon, "VideoEgg's Twig: An ad toolbar that's hard to ignore" (last accessed September 15, 2010), online: http://venturebeat.com/2009/04/15/videoeggs-twig-an-ad-toolbar-thats-hard-to-ignore/

89.    VideoEgg calls it: "video advertising by invitation," which includes the following features:

- In-video ad units.
- Advertisers can run video or any type of flash content.
- Targeting from user profiles.
- Reaches more than 12 million users each month.

90.    The Twig ad bar frames the site and is always visible no matter how far a reader scrolls down the page. Twig is designed for blogs and other sites with comments and other elements that create long pages and cause readers to scroll down past the regular ad units normally on the side.

91.    An advertisement is first presented to a user/viewer as an invitation or "teaser" that attracts the user to the advertisement by necessity so they can close the ad engagement. If the user engages with the invitation, without knowledge of the triggering mechanism, the advertisement might change in some fashion, such as enlarging or taking over the user's display.

92.     One of VideoEgg's patents explains Twig as follows:

[0070]In one embodiment, the calling application makes a request or call to the advertisement manager 225 to embed an advertisement in the webpage or player via an application programming interface (API) provided by the advertisement manager 225. The advertisement manager 225 is a collection of code that manages the user's advertising experience, including loading the XML file, referred to above, from the advertising servers 226, and rendering the advertisement as part of the calling application (in this case player 208). Although the advertisement manager 225 is shown in FIG. 2 as part of the player 208, the advertisement manager 225 is a code library that could reside in any of a number of places within the user's computer 200 or elsewhere that is accessible to the user's computer 200. For example, the advertisement manager 225 could be a FLASH file loaded into the player 208 that is application specific (e.g., .swf).

[0055]Thus, the user is presented with a number of visual clues that engagement with the interaction prompt 508 or the advertisement unit 500 might cause something to happen. As noted above, rather than simply having the advertisement units become active (i.e., change, start to play video or music, take over the window in which they are displayed, expand in size in some way, etc.) when the user moves the mouse over the interaction prompt 508 or over the advertisement unit 500, the interaction prompt could be used to provide the user with a warning or notice of engagement. For example, the change symbol 512 could change from a "plus" sign to a number, such as the number "3", when either the engagement prompt 508 or the advertisement unit 500 was moused over by the user. If the user continued to hold the cursor over the prompt 508 or unit 500 for more than a predetermined period of time, such as one second, the number "3" might change to the number "2". If the user continued to hold the mouse over the prompt 508 or unit 500 as the countdown continued, the advertisement would become

fully active, such as by pausing the other content being viewed and expanding to take over more visual space on the user's computer display.

## H. I Said No! "Don't Stalk Me"

93.     Retargeting online users is simply stalking. To analogize this activity, a consumer visits a mall in the real world to purchase shoes. All sales attempts at the initial store are rejected; however the interest to purchase shoes has been recorded. Customer then visits other stores at the mall and is followed by the shoe salesman stalker periodically offering to sell shoes to the former customer. This activity continues as you venture to your home and work; moreover it continues indefinitely. In the real world the police would be called and the shoe salesman stalker would be arrested for harassment and stalking. Ad retargeting online is identical to this analogy, but virtual, resulting in harassment caused when the zombie cookies become stalker cookies.

94.     VideoEgg's advertisement is engaged once a user "interacts" with the advertisements. Users confronted with annoying pop-ups/ pop-over ads may attempt to move or "drag" the ad to the side of a webpage so they would be able to view the subject matter of the website. Most online users are unaware that IFRAME objects can be dragged around the screen in the same way that popup windows or draggable DIV tags are often used. A left click of the cursor to capture the annoying ad to drag it to the side of the page so a user can read the requested webpage will engage the VideoEgg ad and "consent will be inferred."

95.     Defendant implanted identical code in the Plaintiffs and Class Members' computers resulting in a uniform action to set redundant unique identifiers used to identify and track users overlapping values, activated when they "engaged" the VideoEgg toolbar, differentiated only by the date, time, and user id:

http://core.videoegg.com/#com/videoegg Demo.sol 6/11/2010 9:15:00 PM 6/16/2010 5:44:54 PM 387 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#com\videoegg\[name redacted].sol

http://core.videoegg.com/#com/videoegg OptOut.sol 6/11/2010 9:12:36 PM 6/11/2010 9:12:36 PM 61 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#com\videoegg\[name redacted].sol

http://core.videoegg.com/#com/videoegg Retargeting.sol 6/11/2010 9:15:00 PM 6/11/2010 9:15:00 PM 66 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#com\videoegg\[name redacted].sol

http://core.videoegg.com/#com/videoegg Tearsheet.sol 6/11/2010 9:12:36 PM 6/16/2010 5:44:49 PM 84 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#com\videoegg\[name redacted].sol

http://core.videoegg.com/#com/videoegg Twig.sol 6/11/2010 9:12:36 PM 6/16/2010 5:44:50 PM 79 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#com\videoegg\[name redacted].sol

http://core.videoegg.com/#ve admanager.sol 6/11/2010 9:12:36 PM 6/11/2010 9:12:36 PM 93 C:\Documents and Settings\[name redacted]\Application Data\Macromedia\Flash Player\#SharedObjects\[user id redacted]\core.videoegg.com\#ve\[name redacted].sol

96.     VideoEgg targets ads primarily focusing on users' age, gender, and geographic location. VideoEgg wants its associated websites to "pass on" targeting data such as user age, gender and location, claiming it is "extremely helpful in ensuring that your users see highly relevant ads."

97.     87% of all Americans can be uniquely identified if date of birth, gender and geographic location is known.

> *"Uniqueness of Simple Demographics in the U.S. Population by: Latanya Sweeney. LIDAP-WP4 Carnegie Mellon University, Laboratory for International Data Privacy, Pittsburgh, PA: 2000 (1000)"*

98.     The collection of data by Defendant was wholesale and all-encompassing. Data passing from the users' computers were acquired by Defendant without discrimination as to the kind, type, nature, or sensitivity of the data.  Like the privacy one loses from an airport security body scanner, everything passing through the consumer's Internet connection was intercepted by Defendant, claimed as their property, and traded as a commodity. Regardless of any representations to the contrary—all data—whether sensitive, financial, personal, private, complete with all identifying information, was intercepted, exposing users like fish in a fishbowl.

> *As the level of ad relevance to the user increases, the level of user anonymity decreases. Once these levels are polar opposites, and user relevance is maximized, user's anonymity is no longer anonymous.*

## I. Defendant's Harmful Business Practices

99.     At all relevant times, Defendant's advertising technology has

contained secret information-gathering capacities that were not disclosed to or known by Plaintiffs or the Class and which permitted Defendant to surreptitiously, in an unauthorized manner, and for tortious and unlawful purposes, intercept and access Plaintiffs' and the Class Members' personal and private information, monitor their Internet activity, and create detailed personal profiles based on such information.

100.    At all relevant times, Plaintiffs and the Class, as part of their normal Internet browsing and usage, visited websites that, unbeknownst to them, utilized and/or facilitated tracking and profiling technology. Since they were doing so in the privacy of their own homes or offices, and since Defendant did not display any warning or indication that it was collecting or transmitting personal and private information to or from their computer systems, Plaintiffs and the Class had a reasonable expectation of privacy as to the nature of their activity and the contents of any information they provided to or obtained from a particular website.

101.    Defendant has used those cookies and other surreptitious data-collection methods to secretly intercept and access computer users' personal data and web browsing habits and have transmitted this information to Defendant for its own commercial benefit.

102.    Defendant collected and/or disclosed covered information of Class Members about all or substantially all of their online activity, including across websites.

103.   Defendant's business practice unfairly wrests control from users who choose to delete their cookies in order to avoid being tracked. Advertising networks use unique IDs to identify the same user or computer across many different websites. Users who are aware of this may delete their cookies periodically, believing that the new cookies they receive will contain new unique identifiers, thus hindering the ability of advertising networks to track their behavior across sites. Using Flash cookies to re-identify users overrides this control, with little available redress for users. Although users may arguably protect themselves by periodically deleting their Flash cookies as well, the means for doing so are extremely obscure and difficult even for savvy consumers to use. Flash specifically attempts to obfuscate data within each LSO by controlling the format and forcing a binary serialization of any stored data, thus bypassing the web browser's same-origin security policy, allowing an application hosted on one domain to read data or code hosted on another.

104.   Defendant failed to disclose that its applied technologies also provide Defendant with the ability to surreptitiously intercept, access, and collect electronic communications and information from unsuspecting Internet users—including Plaintiffs and the Class.

105.   Defendant intercepted Class Members' electronic communications for the purpose of committing a tortious or criminal act, and violated the constitutional rights of Plaintiffs and Class Members.

106.   In all cases where some notice was provided, that notice was insufficient, misleading, and inadequate. Consent under such circumstances was impossible.

107.   In no case as alleged in this complaint, was adequate, informed notice provided to any Class Member of the true nature and function of the Defendant service.

108.   Defendant failed to provide opt-out functionality, as of February 2010, which would have allowed either a browser based or flash-based opt-out process. Defendant's opt-out process required users to link to the macromedia. Flash cookie control panel, navigate eight (8) different HTML pages to set their LSO options, and locate the Defendant's domain within the flash control panel.

109.   In any case where the opportunity of 'opting out' of the Defendant's service was provided, such 'opt-out' rights were misleading, untrue, and deceptive.

110.   In no case was the collection of all Internet communication data between the consumer and the Internet halted or affected in any way. All data was still collected. The 'opt-out' only affected what advertisements the consumer was shown. Thus, the provision of the opportunity for opting out was, itself, totally misleading.

111.   Plaintiffs and the Class Members did not voluntarily disclose their personal and private information, including their Internet surfing habits, to Defendant - and indeed never even knew that Defendant existed or conducted data

collection and monitoring activities upon and across plaintiffs' and class member's websites. Plaintiffs and the Class Members provided such information, and had their Internet habits monitored, without their knowledge or consent, and would not have consented having their personal and private information, including their on-line profiles, used for Defendant's commercial gain.

112.   Defendant did not obtain consent from Plaintiffs and Class Members for any collection or use and Plaintiffs and Class Members were not allowed to decline consent at the time such statement was presented to the Class Members.

113.   Defendant did not obtain consent from Plaintiffs and Class Members for any disclosure of covered information to unaffiliated parties and Plaintiffs and Class Members were not allowed to decline consent at the time such statement was presented.

114.   Defendant has covertly, without consent, and in an unauthorized, deceptive, invasive, and fraudulent manner implanted Internet "Flash cookies" upon Internet users' computer hard disk drives to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.

115.   Defendant intentionally accessed Plaintiffs and Class Members' computer without authorization or exceeded authorized access to obtain information from protected computers, involved an interstate communications.

116.   Defendant sold, shared, and/or otherwise disclosed covered

information of Class Members to an unaffiliated party without first obtaining the consent of the Class Members to whom the covered information related to.

117.   At all relevant times, Plaintiffs and Class Members' personal and private information was intercepted by and/or accessed by Defendant and transmitted to it on a regular basis, without alerting Internet users in any manner. As a result, Defendant was able to and did access Plaintiffs' and Class Members' computer systems and/or intercept their electronic communications without authorization. Defendant has obtained, compiled, and used this personal information for its own commercial purposes.

118.   Defendant intercepted Class Members' electronic communications for the purposes of implanting unauthorized Flash cookies on Class Members' computers; repeatedly accessing electronic communications without Class Members' knowledge and consent so as to profile such persons' web browsing habits, secretly tracking Class Members' activities on the Internet and collecting personal information about consumers; and profiting from the use of the illegally obtained information, all to Defendant's benefit and Class Members' detriment.

119.   Defendant intentionally intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept the electronic communication of Plaintiffs and Class Members.

120.   Defendant has knowingly, recklessly, or negligently disclosed, exploited, misappropriated and/or engaged in widespread commercial usage of

Plaintiffs' and the Class' private and sensitive information for Defendant's own benefit without Plaintiffs' or the Class' knowledge, authorization, or consent. Such conduct constitutes a highly offensive invasion of Plaintiffs' and the Class' privacy.

121.   Defendant used and consumed the resources of the Plaintiffs and Class Members' computers and substantially increased their Internet bandwidth by gathering user information and transferring such to Defendant.

122.   Defendant caused harm and damages to Plaintiffs and Class Members' computers finite resources, depleted and exhausted its memory, thus causing an actual inability to use it for its intended purposes, and significant unwanted CPU activity, disk usage, and network traffic resulting in instability issues, such as applications freezing, failure to boot, and system-wide crashes.

123.   Defendant caused harm and damages to the Plaintiffs and Class Members including but not limited to, consumption of their device's finite resources, memory depletion which resulted in the actual inability to use if for its intended purposes.

124.   The cumulative effect, and the interactions between spyware components, caused the symptoms commonly reported by users: "a computer, which slows to a crawl," or "overwhelmed by the many processes running on it."

125.   Defendant's downloads were not evident. Users assumed that the issues related to hardware, Windows installation problems, or another infection,

and resorted to contacting technical support experts, or even buying a new computer because the existing system became too slow. Class Members attempting to repair their own computer risked damaging their system files. Badly infected systems required a clean reinstallation of all their software in order to return to full functionality, with charges of a few hundred dollars to remove viruses and spyware, and unauthorized Flash cookies, if serviced in house. On site repair costs exceeded $40-$60 per hour.

126. Defendant harmed Plaintiffs and Class Members by its actions. The harms included, but were not limited to the following:

     a)    Loss of valuable data by attempts to remove Flash cookies once discovered;

     b)    Incurred economic losses accompanied by an interruption in service;

     c)    Functionality of computer interfered with, including an inability of websites visited once Flash content was disabled;

     d)    Information was deleted, otherwise made unavailable;

     e)    Impaired the integrity and availability of data, programs and information.

127. Defendant VideoEgg's activities with VideoEgg Flash Cookie Affiliates occurred throughout the United States. VideoEgg secretly obtained personal and private information from Plaintiffs and the Class - a course of action

and a body of information that is protected from interception, access, and disclosure by federal law.

128.   Defendant used, interfered with, and intermeddled with Class Members' ownership of their personal property, namely, their computers, by, directly or indirectly, secretly depositing cookies on their computers, secretly accessing their computers to obtain information contained in and enabled by the cookie, and secretly collecting personal data and information regarding each Class Members' Internet surfing habits contained in electronic storage on his/her computer.

129.   Defendant VideoEgg, and VideoEgg Flash Cookie Affiliates, failed to disclose that its software tracks and stores information regarding consumers' Internet use. The installation of such a tracking device would be material to consumers in their decision whether to install the software offered by Defendant or their affiliates or sub-affiliates. Defendant VideoEgg and VideoEgg Flash Cookie Affiliates furthered their improper practices by storing the tracking files in locations on consumers' hard drives that are rarely accessed by consumers, such as in the Windows operating systems folder that principally contains core systems software; writing the tracking code in a manner ensuring that it will not be listed in the Windows Add/Remove utility in conjunction with the software with which it was originally bundled at installation; and failing to list the tracking in the Windows Add/Remove utility, which is a customary location for user-initiated

uninstall of software programs;

130.   Defendant VideoEgg's technology wrongfully monitored Internet users' activities at each and every website users visited and the wrongfulness of this conduct is multiplied by the fact that Defendant aggregates this information about users' habits across numerous websites and unjustly enriched Defendant to the detriment of Plaintiffs and the Class. Plaintiffs and the Class have been harmed, as they have been subjected to repeated and unauthorized invasions of their privacy - violations which continue to this day.

## CLASS ALLEGATIONS
### Allegations as to Class Certification

131.   Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), Plaintiffs bring this action as a Class action, on behalf of themselves and all others similarly situated as members of the following Classes (collectively, the "Class"):

a) U.S. Resident Class: All persons residing in the United States that accessed a VideoEgg Flash Cookie Affiliate website and had a Defendant flash cookie set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.

b) California Resident Class: All persons residing in California that accessed a VideoEgg Flash Cookie Affiliate website and had a Defendant flash cookie set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later. All California Resident Class Members are also members of the U.S. Resident Class.

c) Injunctive Class: All persons after the date of the filing of this

complaint, residing in the United States, that accessed a VideoEgg Flash Cookie Affiliate website and had a Defendant flash cookie set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.

132.    The Class action period, (the "Class Period"), pertains to the date, two years preceding the date of this filing to the date of Class certification.

133.    Plaintiffs reserve the right to revise the class definitions based on facts learned in the course of litigation of this matter.

134.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), Plaintiffs bring this Class action, on behalf of themselves and the following Classes with respect to Plaintiffs' claims for violation of the:

a)  Computer Fraud and Abuse Act ("CFAA"),

b)  California's Computer Crime Law, ("CCCL"),

c)  Trespass to Personal Property / Chattels, and

d)  Unjust Enrichment

> All persons residing in United States who, during the period of two years preceding the date of this filing to the date of Class certification (the "Class Period"), accessed a VideoEgg Flash Cookie Affiliate website and had a Defendant flash cookie set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.
> (hereinafter referred to as "CFAA/ CCCL SubClass.")

135.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), Plaintiffs bring this Class action, on behalf of themselves and the following

Class with respect to Plaintiffs' claims for violation of the:

    a) California's Computer Crime Law ("CCCL"),

    b) California's Invasion of Privacy Act,

    c) Violation of California's Consumer Legal Remedies Act, Civil Code § 1750;

    d) Violation of California's Unfair Competition Law, Business and Professions Code § 17200,

> All persons residing in United States who, during the Class period, and accessed a VideoEgg Flash Cookie Affiliate website and had a Defendant flash cookie set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.
> (hereinafter referred to as "California Resident Class.")

136.   On behalf of the U.S. Resident and California Resident Classes, Plaintiffs seek equitable relief, damages and injunctive relief pursuant to:

    a) Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

    b) California's Computer Crime Law, Penal Code § 502;

    c) California Invasion Of Privacy Act, California Penal Code § 630;

    d) Violation of California's Consumer Legal Remedies Act, Civil Code § 1750;

    e) Violation of California's Unfair Competition Law, Business and Professions Code § 17200;

    f) Trespass to Personal Property / Chattels;

g)  Unjust Enrichment

137.   On behalf of the Injunctive Class, Plaintiffs seek only injunctive relief.

138.   **Persons Excluded From Classes:** Excluded from the proposed Classes are Defendant, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

139.   Plaintiffs reserve the right to revise the definitions of the Classes based on facts they learn during discovery.

140.   **Numerosity:**  The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of members. The precise number of Class Members is unknown to Plaintiffs. The true number of Class Members is known by Defendant, however and, thus, Class Members may be notified of the pendency of this action by electronic mail, and by published notice. Upon information and belief, Class Members can be identified by the electronic records of Defendant.

141.   **Class Commonality:**  Pursuant to Federal Rules of Civil Procedure,

Rule 23(a)(2) and Rule 23(b)(3), are satisfied because there are questions of law and fact common to Plaintiffs and the Class, which common questions predominate over any individual questions affecting only individual members, the common questions of law and fact include, but are not limited to:

a) What was the extent of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practice of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later and how did it work?

b) What information did Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' collect from its business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later, and what did it do with that information?

c) Whether VideoEgg Flash Cookie Affiliate users, by virtue of their visitation to VideoEgg Flash Cookie Affiliate's website, had pre-consented to the operation of VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later;

d) Was there adequate notice, or *any* notice, of the operation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later provided to Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' users?

e) Was there reasonable opportunity to decline the operation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later provided to

Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' users?

f)  Did Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later disclose, intercept, and transmit personally identifying information, or sensitive identifying information, or personal information?

g)  Whether Defendant VideoEgg and VideoEgg Flash Cookie Affiliates devised and deployed a scheme or artifice to defraud or conceal from Plaintiffs and the Class Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' ability to, and practice of, intercepting, accessing, and manipulating, for its own benefit, personal information, and tracking data from Plaintiffs' and the Class' personal  computers via the ability to (and practice of) implant secret "cookies" on  their computers;

h)  Whether Defendant VideoEgg and VideoEgg Flash Cookie Affiliates engaged in deceptive acts and practices in, connection with its undisclosed and systemic practice of implanting, accessing and/or disclosing unique identifiers, tracking data, and personal information on Plaintiffs and the Class' personal computers and using that data to track and profile Plaintiffs' and the Class' Internet activities and personal habits, proclivities, tendencies, and preferences for Defendant's use and benefit;

i)  Did the implementation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later violate the Computer Fraud and Abuse Act, 18 U.S.C.  §§ 1030?

j)  Did the Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later violate the Electronic Communications Privacy Act, 18 U.S.C. § 2510?

k) Did the operation, function, and/or implementation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later violate California's Computer Crime Law, California Penal Code § 502?

l) Did the operation, function, and/or implementation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later violate the California Invasion of Privacy Act, California Penal Code § 630?

m) Did the operation, function, and/or implementation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' business practices of setting a Flash cookie on a user's computer to use its local storage within the Flash media player to back up browser cookies for the purpose of restoring them later unjustly enrich the Defendant herein?

n) Are the Defendant VideoEgg and/or VideoEgg Flash Cookie Affiliates liable under a theory of unjust enrichment for violations of the statutes listed herein?

o) Whether Defendant VideoEgg and VideoEgg Flash Cookie Affiliates participated in and/or committed or is responsible for violation of law(s) complained of herein;

p) Are Class Members entitled to damages as a result of the implementation of Defendant VideoEgg and VideoEgg Flash Cookie Affiliates' marketing scheme, and, if so, what is the measure of those damages?

q) Whether Plaintiffs and members of the Class have sustained damages as a result of Defendant's conduct, and, if so, what is the appropriate measure of damages;

r) Whether Plaintiffs and members of the Class are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct

alleged herein; and

s) Whether Plaintiffs and members of the Class are entitled to punitive damages, and, if so, in what amount.

142. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs and each member of the Class accessed a VideoEgg Flash Cookie Affiliate website and a Flash cookie was set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.

143. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel highly experienced in complex consumer Class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

144. **Superiority:** A Class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the

danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the Class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

145.   In the alternative, the Classes may be also certified because:

    a)  the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for the Defendant;

    b)  the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c)  Defendant have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

146.   The claims asserted herein are applicable to all persons throughout the United States that accessed a VideoEgg Flash Cookie Affiliate website and a Flash cookie was set on their computer to use its local storage within the Flash media player to back up browser cookies for the purposes of restoring them later.

147.   The claims asserted herein are based on Federal law and California law, which is applicable to all Class Members throughout the United States.

148.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records or through notice by publication.

149.   Damages may be calculated from the information maintained in Defendant's records, so that the cost of administering a recovery for the Class can be minimized. The amount of damages is known with precision from Defendant's records.

**Count I**
**Violation of the Computer Fraud and Abuse Act**
**18 U.S.C.  § 1030 *et seq.***

150.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

151.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, referred to as "CFAA," regulates fraud and relates activity in connection with computers, and makes it unlawful to intentionally access a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, thereby obtaining information from such a protected computer, within the meaning of U.S.C. § 1030(a)(2)(C).

152.   Defendant violated 18 U.S.C. § 1030 by intentionally accessing a Plaintiffs' computer, without authorization or by exceeding access, thereby obtaining information from such a protected computer.

153.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), provides a civil cause of action to "any person who suffers damage or loss by reason of a

violation" of CFAA.

154.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i), makes it unlawful to "knowingly cause[s] the transmission of a program, information, code, or command and as a result of such conduct, intentionally cause[s] damage without authorization, to a protected computer," of a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

155.   Plaintiffs' computers are "protected computer[s] . . . which [are] used in interstate commerce and/or communication" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

156.   Defendant violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing a Plaintiffs' computers, without authorization or by exceeding access, thereby obtaining information from such a protected computers.

157.   Defendant violated 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a command embedded within their webpages, downloaded to Plaintiffs' computers, which are protected computers as defined in 18 U.S.C. § 1030(e)(2)(B). By accessing, collecting, and transmitting Plaintiffs' viewing habits, Defendant intentionally caused damage without authorization to those Plaintiffs' computers by impairing the integrity of the computers.

158.   Defendant violated 18 U.S.C. § 1030(a)(5)(A)(ii) by intentionally accessing Plaintiffs and Class Members' protected computers without authorization, and as a result of such conduct, recklessly caused damage to

Plaintiffs and Class Members' computers by impairing the integrity of data and/or system and/or information.

159. Defendant violated 18 U.S.C. § 1030(a)(5)(A)(iii) by intentionally accessing Plaintiffs and Class Members' protected computers without authorization, and as a result of such conduct, caused damage and loss to Plaintiffs and Class Members.

160. Plaintiffs have suffered damage by reason of these violations, as defined in 18 U.S.C. § 1030(e)(8), by the "impairment to the integrity or availability of data, a program, a system or information."

161. Plaintiffs have suffered loss by reason of these violations, as defined in 18 U.S.C. § 1030(e)(11), by the "reasonable cost ... including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

162. Plaintiffs have suffered loss by reason of these violations, including, without limitation, violation of the right of privacy, disclosure of personal indentifying information, sensitive identifying information, and personal information, interception, and transactional information that otherwise is private, confidential, and not of public record.

163. As a result of these takings, Defendant's conduct has caused a loss to

one or more persons during any one-year period aggregating at least $5,000 in value in real economic damages.

164.   Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

165.   Defendant's unlawful access to Plaintiffs' computers and electronic communications has caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendant will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by 18 U.S.C.  § 1030(g).

## Count II
### Violation of California's Computer Crime Law ("CCCL")
### California Penal Code § 502

166.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

167.   The California Computer Crime Law, California Penal Code § 502, referred to as "CCCL" regulates "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

168.   Defendant violated California Penal Code § 502 by knowingly accessing, copying, using, made use of, interfering, and/or altering, data belonging to Plaintiffs and Class Members: (1) in and from the State of California; (2) in the

home states of the Plaintiffs; and (3) in the state in which the servers that provided the communication link between Plaintiffs and the websites they interacted with were located.

169.   Pursuant to California Penal Code § 502(b)(1), "Access means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."

170.   Pursuant to California Penal Code § 502(b)(6), "Data means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."

171.   Pursuant to California Penal Code § 502(b)(8), "Injury means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program."

172.   Pursuant to California Penal Code § 502(b)(10), a "Computer contaminant means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and

are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network."

173.   Defendant has violated California Penal Code § 502(c)(1) by knowingly accessing and without permission, altering, and making use of data from Plaintiffs' computers in order to device and execute business practices to deceive Plaintiffs and Class Members into surrendering private electronic communications and activities for Defendant's financial gain, and to wrongfully obtain valuable private data from Plaintiffs.

174.   Defendant has violated California Penal Code § 502(c)(2) by knowingly accessing and without permission, taking, or making use of data from Plaintiffs' computers.

175.   Defendant has violated California Penal Code § 502(c)(3) by knowingly and without permission, using and causing to be used Plaintiffs' computer services.

176.   Defendant has violated California Penal Code § 502(c)(4) by knowingly accessing and without permission, adding and/or altering the data from Plaintiffs' computers.

177.   Defendant has violated California Penal Code § 502(c)(5) by knowingly and without permission, disrupting or causing the disruption of

Plaintiffs' computer services or denying or causing the denial of computer services to Plaintiffs.

178.   Defendant has violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiffs' computers, computer system, and/or computer network.

179.   Defendant has violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' computers, computer system, and/or computer network.

180.   Defendant has violated California Penal Code § 502(c)(8) by knowingly introducing a computer contaminant into the Plaintiffs' computers, computer system and/or computer network to obtain data regarding Plaintiffs' electronic communications.

181.   California Penal Code § 502(j) states: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

182.   Plaintiffs have also suffered irreparable injury from these unauthorized acts of disclosure, to wit: their personal, private, and sensitive electronic communications have been harvested, viewed, accessed, stored, and used by Defendant, and have not been destroyed, and due to the continuing threat

of such injury, have no adequate remedy at law, entitling Plaintiffs to injunctive relief.

183.   Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

184.   As a direct and proximate result of Defendant's unlawful conduct within the meaning of California Penal Code § 502, Defendant has caused loss to Plaintiffs in an amount to be proven at trial.  Plaintiffs are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e).

185.   Plaintiffs and the Class Members seek compensatory damages, in an amount to be proven at trial, and injunctive or other equitable relief.

186.   Plaintiffs and Class Members have suffered irreparable and incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendant is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

187.   Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendant's violation were willful and, on information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

188.   Defendant's unlawful access to Plaintiffs' computers and electronic communications has caused Plaintiffs irreparable injury.  Unless restrained and

enjoined, Defendant will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by California Penal Code § 502(e).

### Count III
### Violation of the California Invasion of Privacy Act
### Penal Code section 630 et seq.

189.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

190.   California Penal Code section 630 provides, in part:

> Any person who, . . . or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable . . .

191.   On information and belief, each Plaintiff and each Class Member, during one or more of their interactions on the Internet during the Class period, communicated with one or more web entities based in California, or with one or more entities whose servers were located in California.

192.   Communications from the California web-based entities to Plaintiffs and Class Members were sent from California.  Communications to the California

web-based entities from Plaintiffs and Class Members were sent to California.

193.   Plaintiffs and Class Members did not consent to any of the Defendant's actions in intercepting, reading, and/or learning the contents of their communications with such California-based entities.

194.   Plaintiffs and Class Members did not consent to any of the Defendant's actions in using the contents of their communications with such California-based entities.

195.   Defendant is not a "public utility engaged in the business of providing communications services and facilities . . ."

196.   The actions alleged herein by the Defendant were not undertaken: "for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility."

197.   The actions alleged herein by the Defendant were not undertaken in connection with: "the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility."

198.   The actions alleged herein by the Defendant were not undertaken with respect to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

199.   The Defendant directly participated in the interception, reading, and/or learning the contents of the communications between Plaintiffs, Class Members and California-based web entities.

200.   Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

201.   Unless restrained and enjoined, Defendant will continue to commit such acts.  Pursuant to Section 637.2 of the California Penal Code, Plaintiffs and the Class have been injured by the violations of California Penal Code section 631.  Wherefore, Plaintiffs, on behalf of themselves and on behalf of a similarly situated Class of consumers, seek damages and injunctive relief.

**COUNT IV**
**Violations of the Consumer Legal Remedies Act**
**("CLRA") California Civil Code § 1750, et seq.**

202.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

203.   In violation of Civil Code section 1750, et seq. (the "CLRA"), Defendant has engaged and is engaging in unfair and deceptive acts and practices in the course of transactions with Plaintiffs, and such transactions are intended to and have resulted in the sales of services to consumers. Plaintiffs and the Class Members are "consumers" as that term is used in the CLRA because they sought or acquired Defendant's good or services for personal, family, or household purposes. Defendant's past and ongoing acts and practices include but are not limited to:

   a)  Defendant's representations that their services have

       characteristics, uses, and benefits that they do not have, in

violation of Civil Code § 1770(a)(5);

b)  Defendant's representations that their services are of a particular standard, quality and grade but are of another standard quality and grade, in violation of Civil Codes § 1770(a)(7); and

c)  Defendant's advertisement of services with the intent not to sell those services as advertised, in violation of Civil Code § 1770(a)(9).

204.    Defendant's violations of Civil Code § 1770 have caused damage to Plaintiffs and the other Class Members and threaten additional injury if the violations continue. This damage includes the losses set forth above.

205.    At this time, Plaintiffs seek only injunctive relief under this cause of action. Pursuant to California Civil Code, Section 1782, Plaintiffs will and are notifying Defendant in writing of the particular violations of Civil Code, Section 1770 and demand that Defendants rectify the problems associated with their behavior detailed above, which acts and practices are in violation of Civil Code § 1770.

206.    If Defendant fails to respond adequately to Plaintiffs' above described demand within 30 days of Plaintiffs' notice (this lawsuit), pursuant to California Civil Code, Section 1782(b), Plaintiffs will amend the complaint to request damages and other relief, as permitted by Civil Code, Section 1780.

**COUNT V**

## Violations of the Unfair Competition Law ("UCL") California Business and Professions Code § 17200, et seq.

207.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

208.   In violation of California Business and Professions Code § 17200 et seq., Defendant's conduct in this regard is ongoing and includes, but is not limited to, unfair, unlawful and fraudulent conduct.

209.   By engaging in the above-described acts and practices, Defendant has committed one or more acts of unfair competition within the meaning of the UCL and, as a result, Plaintiffs and the Class have suffered injury-in-fact and have lost money and/or property—specifically, personal information and/or registration fees.

210.   Defendant's business acts and practices are unlawful, in part, because they violate California Business and Professions Code § 17500, et seq., which prohibits false advertising, in that they were untrue and misleading statements relating to Defendant's performance of services and with the intent to induce consumers to enter into obligations relating to such services, and regarding statements Defendant knew were false or by the exercise of reasonable care Defendants should have known to be untrue and misleading.

211.   Defendant's business acts and practices are also unlawful in that they violate the California Consumer Legal Remedies Act, California Civil Code, Sections 1647, et seq., 1750, et seq., and 3344, California Penal Code, section 502,

and Title 18, United States Code, Section 1030. Defendants are therefore in violation of the "unlawful" prong of the UCL.

212. Defendant's business acts and practices are unfair because they cause harm and injury-in-fact to Plaintiffs and Class Members and for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, their profit in fees from advertisers and their information assets through the acquisition of consumers' personal information. Defendant's conduct lacks reasonable and legitimate justification in that Defendant has benefited from such conduct and practices while Plaintiffs and the Class Members have been misled as to the nature and integrity of Defendant's services and have, in fact, suffered material disadvantage regarding their interests in the privacy and confidentiality of their personal information. Defendant's conduct offends public policy in California tethered to the Consumer Legal Remedies Act, the state constitutional right of privacy, and California statutes recognizing the need for consumers to obtain material information that enables them to safeguard their own privacy interests, including California Civil Code, Section 1798.80.

213. In addition, Defendant's modus operandi constitutes a sharp practice in that Defendant knew, or should have known, that consumers care about the status of personal information and email privacy but were unlikely to be aware of the manner in which Defendant failed to fulfill their commitments to respect consumers' privacy. Defendant is therefore in violation of the "unfair" prong of the

UCL.

214.   Defendant's acts and practices were fraudulent within the meaning of the UCL because they are likely to mislead the members of the public to whom they were directed.

### Count VI
### Trespass to Personal Property / Chattels

215.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

216.   The common law prohibits the intentional intermeddling with personal property, including a computer, in possession of another that results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

217.   By engaging in the acts alleged in this complaint without the authorization or consent of Plaintiffs and Class Members, Defendant dispossessed Plaintiffs and Class Members from use and/or access to their computers, or parts of them. Further, these acts impaired the use, value, and quality of Plaintiffs' and Class Members' computers. Defendant's acts constituted an intentional interference with the use and enjoyment of the computers. By the acts described above, Defendants, has repeatedly and persistently engaged in trespass to personal property in violation of the common law.

218.   Without Plaintiffs' and Class Members' consent, or in excess of any

consent given, Defendant knowingly and intentionally accessed Plaintiffs' and Class Members' property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the property and causing injury to Plaintiffs and the members of the Class.

219.   Defendant engaged in deception and concealment in order to gain access to Plaintiffs and Class Members' computers.

220.   Defendant undertook the following actions with respect to Plaintiffs' and Class Members' computer:

    a) Defendant accessed and obtained control over the user's computer;

    b) Defendant caused the installation of a new code onto the hard drive of the user's computer;

    c) Defendant programmed the operation of its code to function and operate without notice or consent on the part of the owner of the computer, and outside of the control of the owner of the computer.

221.   All these acts described above were acts in excess of any authority any user granted when he or she visited the VideoEgg Flash Cookie Affiliates' websites and none of these acts was in furtherance of users viewing the VideoEgg Flash Cookie Affiliates websites. By engaging in deception and misrepresentation, whatever authority or permission Plaintiffs and Class Members may have granted to VideoEgg Flash Cookie Affiliates was vitiated.

222.   Defendant's installation and operation of its program used, interfered, and/or intermeddled with Plaintiffs' and Class Members' computer systems. Such use, interference and/or intermeddling was without Class Members' consent or, in the alternative, in excess of Plaintiffs' and Class Members' consent.

223.   Defendant's installation and operation of its program constitutes trespass, nuisance, and an interference with Class Members' chattels, to wit, their computers.

224.   Defendant's installation and operation of its program impaired the condition and value of Class Members' computers.

225.   Defendant's trespass to chattels, nuisance, and interference caused real and substantial damage to Plaintiffs and Class Members.

226.   As a direct and proximate result of Defendant's trespass to chattels, nuisance, interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members' property, Defendant has injured and impaired in the condition and value of Class Members' computers, as follows:

a) By consuming the resources of and/or degrading the performance of Plaintiffs' and Class Members' computers (including hard drive space, memory, processing cycles, and Internet connectivity);

b) By diminishing the use of, value, speed, capacity, and/or capabilities of Plaintiffs' and Class Members' computers;

c) By devaluing, interfering with, and/or diminishing Plaintiffs' and

Class Members' possessory interest in their computers;

d) By altering and controlling the functioning of Plaintiffs' and Class Members' computers;

e) By infringing on Plaintiffs' and Class Members' right to exclude others from their computers;

f) By infringing on Plaintiffs' and Class Members' right to determine, as owners of their computers, which programs should be installed and operating on their computers;

g) By compromising the integrity, security, and ownership of Class Members' computers; and

h) By forcing Plaintiffs and Class Members' to expend money, time, and resources in order to remove the program installed on their computers without notice or consent.

**Count VII**
**Unjust Enrichment**

227.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

228.   A benefit has been conferred upon all Defendants by Plaintiffs and the Class. On information and belief, Defendant, directly or indirectly, have received and retain information regarding online communications and activity of Plaintiffs, and Defendant has received and retain information regarding specific purchase and

transactional information that is otherwise private, confidential, and not of public record, and/or have received revenue from the provision of such information.

229.   Defendant appreciates or has knowledge of said benefit.

230.   Under principles of equity and good conscience, Defendant should not be permitted to retain the information and/or revenue that it acquired by virtue of its unlawful conduct.  All funds, revenues, and benefits received by Defendant rightfully belong to Plaintiffs and the Class, which Defendant has unjustly received as a result of its actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

A. Certify this case as a Class action on behalf of the Classes defined above, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

B. Declare that the actions of Defendant, as set out above, violate the following:

   a)  Computer Fraud and Abuse Act, 18 U.S.C.  § 1030;

   b)  California's Computer Crime Law, Penal Code § 502;

   c)  California's Invasion Of Privacy Act, California Penal Code § 630;

   d)  California's Consumer Legal Remedies Act, Civil Code § 1750;

   e)  California's Unfair Competition Law, Business and Professions Code § 17200;

f) Trespass to Personal Property / Chattels;

g) Unjust Enrichment

C. As applicable to the Classes *mutatis mutandis*, awarding injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendant from engaging in the acts alleged above; (ii) requiring Defendant to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) requiring Defendant to delete all data surreptitiously or otherwise collected through the acts alleged above; (iv) requiring Defendant to provide Plaintiffs and the other Class Members a means to easily and permanently decline any participation in any data collection activities; (v) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged herein; and (vi) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendant;

D. Award damages, including statutory damages where applicable, to Plaintiffs and Class Members in an amount to be determined at trial;

E. Award restitution against Defendant for all money to which Plaintiffs and the Classes are entitled in equity;

F. Restrain Defendant, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with them from continued access, collection, and transmission of Plaintiffs and Class Members' personal information via preliminary and permanent injunction;

G. Award Plaintiffs and the Classes:

a) their reasonable litigation expenses and attorneys' fees;

b) pre- and post-judgment interest, to the extent allowable;

c) restitution, disgorgement and/or other equitable relief as the Court deems proper;

1

d) compensatory damages sustained by Plaintiffs and all others similarly

2

situated as a result of Defendant's unlawful acts and conduct;

3

e) statutory damages, including punitive damages;

4

f) permanent injunction prohibiting Defendant from engaging in the

5

6

conduct and practices complained of herein;

7

8

H. For such other and further relief as this Court may deem just and proper.

9

10

Dated this 23rd day of September 2010.

11

12

By:   David C. Parisi

13

David Parisi (SBN 162248)

14

dcparisi@parisihavens.com

15

Parisi & Havens LLP

15233 Valleyheart Drive

16

Sherman Oaks, California 91403

17

Telephone:   (818) 990-1299

18

Joseph H. Malley (not admitted)

19

malleylaw@gmail.com

Law Office of Joseph H. Malley

20

1045 North Zang Blvd

21

Dallas, TX 75208

Telephone: (214) 943-6100

22

23

24

25

26

27

28

1

## JURY TRIAL DEMAND

2

The Plaintiffs hereby demand a trial by jury of all issues so triable.

3

Dated this 23rd day of September 2010.

4

5

By:   David C. Parisi

6

7

David Parisi (SBN 162248)
dcparisi@parisihavens.com

8

Parisi & Havens LLP

9

15233 Valleyheart Drive
Sherman Oaks, California 91403

10

Telephone:   (818) 990-1299

11

12

Joseph H. Malley (not admitted)
malleylaw@gmail.com

13

Law Office of Joseph H. Malley
1045 North Zang Blvd

14

Dallas, TX 75208

15

Telephone: (214) 943-6100

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint
80

# DECLARATION OF DAVID C. PARISI

I, David C. Parisi, hereby declare on oath as follows:

1.      I am an attorney licensed to practice law in the state of California.  I am over the age of 18 years and I have personal knowledge of the matters attested to herein.  If called upon to testify, I would and could competently do so.

2.      I make this declaration pursuant to California Civil Code section 1780(c) on behalf of my clients, plaintiffs Timothy Davis, Jessica Fishbein, Jeff Hall, Amanda Spear, on behalf of themselves and all others similarly situated.

3.      Defendant VideoEgg's principle executive offices and headquarters are located at 18 Townsend St., 3rd Fl., San Francisco, CA 94107.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Dated this 23rd day of September 2010 at Sherman Oaks, California.

_____

David C. Parisi

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV10- 7112 CBM (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
David C. Parisi (SBN 162248)
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TIMOTHY DAVIS; JESSICA FISHBEIN; JEFF
HALL; and AMANDA SPEAR, individuals, on behalf
of themselves and others similarly situated,

PLAINTIFF(S)

v.

VIDEOEGG, INC., a Delaware Corporation,

DEFENDANT(S).

CASE NUMBER

CV10  7112  CBm(EmOx)

**SUMMONS**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, __David C. Parisi_____, whose address is __Parisi & Havens LLP, 15233 Valleyheart Drive, Sherman Oaks, California  91403__.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __2 3 SEP 2010__

By: _____
MARK DAVIS
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
TIMOTHY DAVIS; JESSICA FISHBEIN; JEFF HALL; and AMANDA SPEAR, individuals, on behalf of themselves and others similarly situated

**DEFENDANTS**
VIDEOEGG, INC., a Delaware Corporation

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
David C. Parisi, Suzanne Havens Beckman, Parisi & Havens LLP, 15233 Valleyheart Drive, Sherman Oaks, California 91403, (818) 990-1299

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Viol. of: (1) 18 U.S.C. § 1030; (2) CA Pen. Code § 502; (3) CA Pen. Code § 630 ; (4) CA Civil Code § 1750; (5) CA Bus. & Prof. Code § 17200;
(6) Trespass to Chattels/Personal Property; (7) Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |

# CV10 7112

FOR OFFICE USE ONLY:   Case Number:_____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑Yes
If yes, list case number(s): 10-CV-05484-GW; 10-CV-05716-GW; 10-CV-5948-SVW; 10-CV-01256-JVS; 10-CV-6586-RSWL

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Counties outside of this district: San Francisco<br>Other States: Florida; Oregon; Texas |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Counties outside of this district: San Francisco<br>Other States: Florida; Oregon; Texas |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date September 22, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |